Filed 1/21/14  P. v. Ross CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056871 |
| v. | (Super.Ct.No. FBA1100478) |
| CHARLES EDWARD ROSS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Rodney A. Cortez, Judge.  Affirmed.

John N. Aquilina, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Lilia E. Garcia and Raquel M. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

1

Following a jury trial, defendant Charles Edward Ross was convicted of involuntary manslaughter. (Pen. Code,[1] § 192, subd. (b).) The jury also found true the allegation that he personally used a firearm. (§ 12022.5, subd. (a).) He appeals, contending the trial court erred in failing to instruct the jury on the element of self-defense or defense of others in relation to involuntary manslaughter.[2]

## I. FACTS

Defendant's aunt, Kathy Hunter, and Michelle Springfield were next-door neighbors in a duplex located on Carson Street in Barstow. On August 2, 2011, at approximately 3:00 or 4:00 p.m., Springfield's sister, Sherell Allen, had an argument with one of Hunter's daughters (who is also defendant's cousin).[3] When Springfield noticed the argument "was going to get physical," she interjected herself between the two and told them to "let it go." Other females arrived, and the verbal fight escalated to a physical fight. Springfield collected her children and left the area, as those remaining were "yelling and screaming."

Hours later, about 9:00 p.m., Springfield returned with three women and her brother to get some clothing and other items because she wanted to move out. Springfield told her brother that everything would be all right, and he left. When the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Defendant has petitioned for a writ of habeas corpus in case No. E058958. We ordered the writ petition to be considered with this appeal. By separate order, we summarily deny the writ petition.

[3] Hunter claimed that Allen got into an argument with a friend of one of Hunter's daughters, and then Springfield joined in the argument.

2

women were in the driveway, Springfield heard a gunshot. Springfield's best friend, Laticia Davis, was hit and fell down. Springfield heard approximately 15 shots, which sounded as if they were coming from her yard. Neighbors testified the first shots were from a shotgun, followed by sounds made by smaller caliber weapons. Davis died.

At the crime scene, police found three shotgun shell casings and four .380 casings corresponding to a handgun. Davis died from shotgun injuries to her neck, chest and abdomen. The shooter fired at her from about 30 feet away, and "it was the left side of her body that was essentially facing the barrel of the shotgun."

Angelica Webb[4] told Detective Keith Libby of the Barstow Police Department that defendant ("Booba") had asked her for a ride to Walmart.[5] In the car, defendant removed a box of shotgun shells from his Walmart bag, pocketed some, and handed the box to Marc Williams ("Deuce") stating, "'I need some of these,'" or "'I need a couple of these.'" Webb told the detective that when they returned from the store, as they approached Hunter's[6] house, she heard other people asking defendant if he had "gotten any rounds for the shotgun." Defendant nodded affirmatively. Springfield and her companions did not have a gun.

---

[4] Webb was on probation following her guilty plea on December 14, 2011, to accessory to murder based on the instant shooting.

[5] Prior to the trip to Walmart, defendant asked for a ride to the store to "get ammunition for the Mossberg and to . . . 'load up.'"

[6] Hunter pled guilty to being accessory to murder, was sentenced to 16 months in state prison, and served the time in county jail for her involvement in the instant shooting.

3

Defendant testified that he arrived at the Hunter house after the physical altercation between the women. Defendant said a red sport utility vehicle (SUV) with three or four men arrived, asking "which niggas beat up their two females." The men "jumped in" Hunter's and Steven Johnson's[7] faces, then left saying they would "be back with . . . heat." Defendant understood the men would come back "to do damage, kill, shoot." Defendant had a Mossberg shotgun in his trunk. He went to Walmart to buy ammunition because he feared for his life and believed his family was in danger. When he returned to Hunter's house, he loaded his shotgun and placed it in his aunt's closet in her bedroom.

Defendant, his wife, and grandchildren left for home. As soon as they turned onto their street, one of Hunter's daughters called, saying that someone was banging on the door trying to get in. Defendant dropped off his wife and grandchildren and returned to Hunter's house. While inside Hunter's house, Johnson banged on the door, saying, "Open the door, open the door because these niggas got guns." Defendant saw about 12 people arrive in three cars and run toward the house, yelling, "'Bring your bitch asses outside. We've got—we brought guns for that ass."

Defendant got the shotgun and went out into the backyard. He claimed he saw someone's arm go up with a gun in his hand, pointed toward Hunter's house. Defendant fired a shot in the air. He saw a man standing there who shot three times, and everyone ran. Defendant fired another shot in the air. He told them to get off Hunter's property.

---

[7] Johnson is defendant's cousin.

4

More shots were fired, and defendant fired a third shot into the air. In addition to his three shots, defendant stated he heard "at least seven" other shots. He claimed that he never aimed at anyone. When he heard that someone had been hit, he took off because he was scared; however, he later turned himself in to the Moreno Valley Police Department. Defendant told Detectives Libby and Angel Nevarez, "'You know I didn't do it. You know I wasn't even there[.]'"

## II. SHOULD THE TRIAL COURT HAVE INSTRUCTED THE JURY ON THE ELEMENT OF SELF-DEFENSE OR DEFENSE OF OTHERS IN RELATION TO THE CRIME OF INVOLUNTARY MANSLAUGHTER?

Defendant faults the trial court for failing to instruct on self-defense or defense of others as an element of the crime of involuntary manslaughter, of which he was convicted. He argues that "[a]s a result of the trial court's error in removing this essential and critical element from the jury's consideration, [he] was deprived of his constitutional rights to a fair jury trial, the presumption of innocence, to present a defense, and due process of law, as guaranteed him by the Fifth, Sixth, and Fourteenth Amendments and article I, sections 7, 15, and 16 of the California Constitution."

### A. Further Background Information

Defendant was charged with murder in violation of section 187. While discussing jury instructions, defense counsel requested that the jury be instructed with CALCRIM Nos. 505 (Justifiable Homicide: Self-Defense or Defense of Another) and 571 (Voluntary Manslaughter: Imperfect Self-Defense-or Imperfect Defense of Another—Lesser Included Offense). The prosecutor objected on the grounds of insufficient evidence of

5

self-defense, stating: "There's been some statements that people were coming back with guns, but no witness has testified that they saw anyone else with a gun." The trial court reserved ruling until the conclusion of all testimony.

After the prosecution rested, defense counsel moved for acquittal (§ 1118.1) as to the murder charge, on the ground there was no showing that defendant murdered the victim with malice aforethought. The prosecutor opposed the request and the motion was denied. Defense counsel then requested that the jury be instructed on voluntary manslaughter based on sudden quarrel and imperfect self-defense. He argued, "[T]here's plenty of evidence to allow me to argue imperfect self-defense." The court asked what evidence was presented to support defendant's thought process that he had to defend himself or another. Defense counsel referred to the presence of children and defendant inside Hunter's house when the threats were made. The prosecutor disagreed, stating: "As far as the sudden quarrel, the quarrel had been over for hours. The quarrel had taken place between Angelica Webb and Michelle and Sherell Springfield. Hours before, that quarrel had ended. The defendant—those threats had been made at that time and those individuals had left the location. [¶] The . . . evidence has shown that the defendant came over after. Upon hearing of the possible threats, rather than taking his family away from the scene and protecting them in that way, he chose to go and get ammunition for a firearm and set himself up in a location where he could not defend at the front door, but shoot at anyone coming up the driveway. He wasn't in a location to protect the children inside the house. He was in a location to prevent anyone from approaching. [¶] The evidence has also shown that other shots that may have been fired were fired after the

6

defendant fired the shotgun. We have heard from at least two witnesses who testified that they heard the shotgun blasts first, followed by handgun blasts after. People do not feel that there has been a sufficient showing to justify self-defense, imperfect self-defense, or sudden quarrel instructions or argument to the jury."

Following argument, the court stated, "California law requires trial court sua sponte to instruct fully on all lesser necessarily included offenses supported by the evidence. And in this case, the court finds there's sufficient evidence for the court to instruct on voluntary manslaughter for both theories of heat of passion as well as imperfect self-defense. The instructions for those obviously include a cooling-off period. So they will still be instructed on that issue. And that's for the jury to determine, was there a sufficient period of time for the defendant to have cooled off? [¶] And so I think that based upon the circumstances that have been presented, at least one juror could come to the conclusion that there was heat of passion."

Prior to presentation of the defense, defense counsel indicated "there might be an involuntary verdict form following my client's testimony . . . ." After defendant testified, defense counsel formalized his request for an instruction on involuntary manslaughter. The prosecutor objected, arguing the evidence was insufficient to support such instruction because (1) defendant knew there was a large crowd of people; (2) he could not have fired solely into the air, because the victim was shot; and (3) he intended to fire the gun. Rejecting the prosecutor's objection, the trial court stated: "The issue isn't whether he intended to fire the gun. The issue is whether, when he intended to fire the gun, he had intent to kill, whether he had malice. If he is to be believed that he just fired the gun in

7

the air, it would tend to lead to the counsel's argument that he lacked malice. And when a defendant lacks malice and evidence supports a lack of malice, the court has a sua sponte obligation to instruct on involuntary manslaughter."

Although defendant was charged with murder (§ 187), the evidence supported instructions on the lesser included offenses of voluntary manslaughter (§ 192, subd. (a)) and involuntary manslaughter (§ 192, subd. (b)). Thus, the jury was instructed with CALCRIM Nos. 500 (Homicide: General Principles); 505 (Justifiable Homicide: Self-Defense or Defense of Another); 520 (First or Second Degree Murder With Malice Aforethought); 521 (First Degree Murder); 522 (Provocation: Effect on Degree of Murder); 570 (Voluntary Manslaughter: Heat of Passion—Lesser Included Offense); 571 (Voluntary Manslaughter: Imperfect Self-Defense or Imperfect Defense of Another—Lesser Included Offense); 580 (Involuntary Manslaughter: Lesser Included Offense); 640 (Deliberations and Completion of Verdict Forms for Use When Defendant Is Charged With First Degree Murder and Jury Is Given Not Guilty Forms for Each Level of Homicide); and 970 (Shooting Firearm or BB Device in Grossly Negligent Manner).

As it relates to involuntary manslaughter, the jury was told that to prove defendant's guilt, the prosecution had to prove he committed a crime with criminal negligence and that his actions unlawfully caused the death of another person. (§ 192, subd. (b); CALCRIM No. 580; *People v. Cook* (2006) 39 Cal.4th 566, 596.) Regarding the underlying crime that was committed, namely, discharging a firearm in a grossly negligent manner, the trial court instructed the jury that the prosecution must prove defendant intentionally discharged a firearm with gross negligence, and that the shooting

8

could have resulted in the injury or death of a person. (§ 246.3; CALCRIM No. 970; *People v. Robertson* (2004) 34 Cal.4th 156, 167, overruled on other grounds as stated in *People v. Chun* (2009) 45 Cal.4th 1172, 1200-1201.) However, the trial court omitted the following language from CALCRIM No. 970: "The defendant did not act (in self-defense/ [or] in defense of someone else).]" (CALCRIM No. 970 (2012).)

## B. Analysis

"It is well settled that a defendant has a right to have the trial court . . . give a jury instruction on any affirmative defense for which the record contains substantial evidence [citation]—evidence sufficient for a reasonable jury to find in favor of the defendant [citation]—unless the defense is inconsistent with the defendant's theory of the case [citation]. In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt . . . .' [Citations.]" (*People v. Salas* (2006) 37 Cal.4th 967, 982-983.) CALCRIM No. 970 states that in order to convict of the crime of grossly negligent discharge of a firearm, the People must prove that (1) the defendant intentionally shot a firearm, (2) he did so with gross negligence, (3) the shooting could have resulted in injury or death of a person, and (4) "[[t]he defendant did not act (in self-defense/ [or] in defense of someone else).]" (CALCRIM No. 970 (2012).) The fourth element is optional; however, the court must sua sponte instruct the jury that the People must also prove that *the defendant did not act in self-defense or defense of someone else* when "there is

9

sufficient evidence of self-defense or defense of another . . . .'" (Bench Notes to CALCRIM No. 970, p. 775.)[8]

At issue then is whether the trial court's error in not instructing the jury on this fourth element (that defendant did not act in self-defense or defense of another) was prejudicial. We conclude it was not.

"[A]n erroneous instruction that omits an element of an offense is subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. [Citations.] In general, the *Chapman* test probes 'whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." [Citations.]' [Citation.]" (*People v. Gonzalez* (2012) 54 Cal.4th 643, 662-663.) Thus, "even when jury instructions completely omit an element of a crime, and therefore deprive the jury of the opportunity to make a finding on that element, a conviction may be upheld under *Chapman* where there is no 'record . . . evidence that could rationally lead to a contrary finding' with respect to that element. [Citations.]" (*People v. Davis* (2005) 36 Cal.4th 510, 564.)

---

[8] While we proceed on the theory that the trial court erred, we question whether the evidence, while sufficient to support an instruction on self-defense or defense of others relating to murder or voluntary manslaughter, was sufficient to support instructing the jury with the fourth element of CALCRIM No. 970 in regard to involuntary manslaughter by shooting a firearm in a grossly negligent manner. We note there was no evidence, other than defendant's self-serving version of the facts, that anyone other than defendant was the initial aggressor. Witnesses testified they heard the shotgun shots prior to hearing shots from any other weapons. More importantly, under his own version of events, defendant fired shots in the air, not at the crowd.

"On review, we examine the jury instructions as a whole, in light of the trial record, to determine whether it is reasonably likely the jury understood the challenged instruction in a way that undermined the presumption of innocence or tended to relieve the prosecution of the burden to prove defendant's guilt beyond a reasonable doubt. [Citation.]" (*People v. Paysinger* (2009) 174 Cal.App.4th 26, 30.)

To begin with, defendant's sole defense was that he acted in self-defense or defense of others.[9] Thus, in addition to being instructed on the charge of murder, and the lesser offense of voluntary manslaughter, the jury received instructions on self-defense. (CALCRIM Nos. 505, 571.) The jury learned that when defendant "kills with a legally valid excuse or justification, the killing is lawful" and he "has not committed a crime." (CALCRIM No. 500.) Further, they were told it was the People's burden to prove beyond a reasonable doubt "that the killing was not justified," and if they failed to do so, then the jurors "must find the defendant not guilty of murder." (CALCRIM No. 505.) Also, they were told that if they found defendant "acted in complete self-defense or defense of another, his action was lawful and [the jury] must find him not guilty of any crime." (CALCRIM No. 571.) Moreover, they were told to "[P]ay careful attention to all of these instructions and consider them together." (CALCRIM No. 200.)

---

[9] Defendant references "consistent instructions relating to self-defense and defense of others as to the offenses charged and both of the lesser included offenses . . . ." However, the fourth element of CALCRIM No. 970 requires the People to prove that defendant *did not act* in self-defense and defense of others. This is inconsistent with his defense theory that he *did act* in self-defense and defense of others, and it is inconsistent with his request for instructions on self-defense and defense of others.

11

As defendant notes, the jury's rejection of murder and voluntary manslaughter implies it accepted his claim that he acted in self-defense. Thus, regarding the lesser offense of involuntary manslaughter by shooting a firearm in a grossly negligent manner, to have charged the jury with CALCRIM No. 970's fourth element (i.e., that the defendant did not act in self-defense or defense of others) would have been inconsistent with defendant's primary theory of the case, and it would have subjected defendant to the possibility of being convicted of murder or voluntary manslaughter.

Nonetheless, the jury was otherwise fully instructed on the issue of self-defense, was told that if defendant acted in actual self-defense he was not guilty of any crime, and to consider the instructions together. Although it perhaps would have been desirable to include the fourth element regarding self-defense in CALCRIM No. 970, or to simply state in the instruction that if defendant acted in self-defense he was not guilty of any crime, including both charged offenses and lesser included offenses, the jury was nevertheless instructed that if defendant acted in actual self-defense, he was not guilty of any crime. The jury was instructed to "[P]ay careful attention to all of these instructions and consider them together." "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions. [Citation.]" (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) If the jury followed the instruction to consider the instructions together, as we must presume that it did (*ibid*.), it is not plausible that including the fourth element in CALCRIM No. 970 would have resulted in an all out acquittal. Accordingly, we conclude it was not reasonably probable

12

that defendant would have obtained a more favorable outcome had the court not erred in omitting the fourth element of CALCRIM No. 970.

## III. DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
Acting P. J.

We concur:

KING
J.

MILLER
J.